JAMES M. JOHNSON (Cal. Bar No. 229811)
JOHNSON TRIAL LAW, LLC
100 Wilshire Boulevard
Suite 700
Santa Monica, CA 90401
Telephone: (424) 272-6680
Email: james@johnsontrial.com

V. JUSTIN ARPEY (*admission pro hac vice pending*)
PARKER HUDSON RAINER & DOBBS LLP
303 Peachtree Street, N.E.
Suite 3600
Atlanta, Georgia 30308
Telephone: (404) 523-5300
Facsimile: (404) 522-8409
Email: jarpey@phrd.com

**Attorneys for Plaintiff Jane Doe**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE,<br><br>       Plaintiff,<br><br>    vs.<br>UBER TECHNOLOGIES, INC.,<br>RASIER, LLC, and RASIER-CA, LLC,<br><br>      Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jane Doe ("Doe"), by and through her undersigned counsel, brings this Complaint for Damages against Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively referred to "Defendants" or "Uber"), and respectfully shows the Court as follows:

**<u>Introduction and Nature of Action</u>**

This action arises out of a sexual assault perpetrated by an Uber driver on Jane Doe that occurred in August 2019. Though Doe reported the incident to Uber, Uber

failed and refused to take the matter seriously and investigate the assault. Instead, contrary to multiple and repeated statements made by Uber in its recently-published *2017-2018 US Safety Report*, Uber essentially ignored Doe's allegations of sexual assault. Uber's obstinance is shocking, not only because of the nature of the allegations, but also because this is exactly the type of behavior that Uber has publicly vowed it does not, and will not, tolerate. As Uber stated in its Safety Report, "Uber does not tolerate sexual assault or misconduct from anyone, anywhere, at any time. We take all allegations of sexual assault and sexual misconduct extremely seriously and work to take action quickly and fairly." If only Uber walked the walk instead of just talking the talk.

As detailed further herein, Uber is liable to Doe for the grotesque assault perpetrated on her by its driver, both as a common carrier and under the doctrine of respondeat superior. Furthermore, Uber's knowledge and concealment of the staggering number of sexual assaults and sexual misconduct reported to it, as well as its continued practice of marketing its ride-hailing platform as a safe way to travel—particularly for intoxicated users—constitutes common law fraud.

### The Parties

1.      "Jane Doe" is not Plaintiff's real name; it is a pseudonym to protect her identity due to the sensitive and personal nature of the allegations in this Complaint. Filed contemporaneously with this Complaint is an application to the Court for an order allowing Plaintiff to use the pseudonym "Jane Doe."

2.      Jane Doe is a natural person and a citizen of the state of Georgia.

3.      Defendant Uber Technologies, Inc. ("Uber Technologies"), is a Delaware Corporation with its principal place of business located in San Francisco, California. Defendant Uber Technologies may be served with process through its registered agent in Califorina, CT Corporation System, located at 818 West Seventh Street, Suite 930 Los Angeles, CA 90017.

4.      Defendant Rasier, LLC ("Rasier") is a Delaware Limited Liability Company with its principal place of business located in San Francisco, California. Defendant Rasier may be served with process through its registered agent in California, CT Corporation System, located at 818 West Seventh Street, Suite 930 Los Angeles, CA 90017.

5.      Defendant Rasier-CA, LLC ("Rasier-CA") is a Delaware Limited Liability Company with its principal place of business located in San Francisco, California. Defendant Rasier-CA may be served with process through its registered agent in Califorina, CT Corporation System, located at 818 West Seventh Street, Suite 930 Los Angeles, CA 90017.

6.      Defendants Uber Technologies, Inc., Rasier, LLC, and Rasier-CA, LLC (collectively referred to "Defendants" or "Uber") operate throughout the United States, including in the states of Georgia and California.

## Jurisdiction

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. There is diversity of citizenship as Jane Doe is domiciled in Georgia and Defendants are domiciled in Delaware and California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      This Court has personal jurisdiction over Defendants because Defendants are domiciled in California and Defendants' principal place of business is in San Francisco, California. Furthermore, Defendants operate in the state of California, including in San Francisco.

## Intradistrict Assignment

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant Uber Technologies has its headquarters in, and resides in, San Francisco County, California.

**Factual Allegations**

**Uber, the Largest "Ride-Hailing" Company in the U.S., Employs Hundreds of Thousands of Drivers Across the Country.**

10.     Defendant Uber is a pioneer of the "ride-hailing" industry, where, instead of using traditional methods of transportation such as public transit or private taxi cabs, customers or "users" download the Uber phone application (the "Uber App") to their smartphone and "call" for one of Uber's millions of drivers to pick the user up at a pre-determined location and transport the user to their desired destination.

11.     Defendant Uber is the largest and most popular ride-hailing company in the nation, with 1.3 billion trips booked via the Uber App completed in the United States in 2018, or more than 3 million Uber trips every day, according to Uber. In 2018, Uber reported revenue of $11.3 billion, and the company has boasted of double-digit revenue growth for the last several years.

12.     Uber's business model is dependent on having a large pool of non-professional drivers to facilitate its ride-hailing services.

13.     Uber employs these non-professional drivers using either their own vehicles or vehicles which Uber helps them secure, as a means for Uber to carry out their core business of providing users with transportation.

14.     In 2015, Uber employed approximately 1 million drivers around the world. As of December 2019, Uber employs approximately 3.9 million drivers worldwide. While the exact number is unclear, upon information and belief, approximately 1 million of the drivers currently employed by Uber are based in the United States.

15.     Uber employs its drivers in the United States, including the driver who sexually assaulted Doe, through traditional at-will employment relationships.

16.     This at-will employment is demonstrated by the relationship between Uber and its drivers.

17.     Uber has the discretion to fire its drivers for any reason at any time.

Uber retains control over the manner and means by which drivers offer rides through the Uber App.

18.     Fare prices are set exclusively by Uber; its drivers have no input on the fares charged to customers, and drivers may not negotiate fares with riders.

19.     Uber retains a portion of the fare of every ride charged to a user.

20.     Uber retains the right to modify the charges to the customer if the company deems that a driver took a circuitous or otherwise inappropriate route for the trip.

21.     Uber retains control over the rider's contact and payment information and drivers are not allowed to discuss arranging trips with users outside of the Uber App.

22.     Uber requires drivers to place an Uber decal on their vehicles so that drivers can represent to the public that they drive for Uber.

23.     The Uber App tracks every driver's trip and reconciles the information to ensure that the fare for that trip is correct. If the route changes or a new destination is requested during a trip, the Uber App will automatically adjust the fare accordingly.

24.     Upon information and belief, Uber requires drivers to accept all or substantially all ride requests when they are logged into the Uber App or else face potential discipline from the company.

25.     Uber prohibits its drivers from accepting "off-app pickups" or "street hails," and prohibits drivers from accepting payment for trips outside of the Uber App.

26.     Upon information and belief, Uber requires drivers to dress professionally, keep their vehicle clean, communicate with the customer when the driver is near the pickup location, and pick the customer up on the same side of the street on which the customer is waiting.

27.     Uber employs a system where users give drivers feedback and a rating from one to five stars, and this system is used by Uber to discipline and terminate drivers.

**Uber Promotes Itself as a Safe Way to Travel Despite its Relaxed Driver Application and Screening Protocol and Actual Knowledge of Driver Misconduct.**

28.     Uber's success has been founded upon convincing its customers and the public at large that Uber rides are a safe, convenient, and cost-effective alternative to calling a taxi cab or using other traditional transportation methods (most of which are heavily regulated by state and federal governments, as opposed to Uber's largely unregulated activities).

29.     Uber has aggressively marketed itself, its drivers, and its platform as being safe, and a safe way for the public to travel, noting on its website that "[t]he Uber experience was built with safety in mind."

30.     Uber's website notes that the company "uses technology to ensure the safety of our riders and drivers before, during **and after** every ride." (emphasis added).

31.     Uber's website also notes that "[t]hrough incident prevention tools, insurance coverage, and technology that keeps you connected, we're dedicated to helping you move safely and focus on what matters most."

32.     As an additional example, when Uber began charging a "safe ride fee," the company explained that it has "always been committed to connecting you with the safest rides on the road."

33.     Additionally, Uber has specifically and intentionally marketed itself to the public as a safe way for users who are intoxicated to travel without putting themselves at risk.

34.     As an example, Uber partnered with Mothers Against Drunk Driving ("MADD") for marketing campaigns, including for a promotion in 2018 where Uber and MADD campaigned to "eliminate any excuse for drinking and driving," promoting Uber as a safe alternative for customers consuming alcohol to avoid drinking and driving.

35.     Uber ran a similar campaign in December 2019, explaining that "Mothers Against Drunk Driving (MADD) and Uber are teaming up to remind you to not get behind the wheel after drinking when there are a million reasons to ride," further promoting itself as a safe alternative for intoxicated customers.

36.     As an additional example, Uber explains on its website that riders can give their Uber drivers "compliments" through the Uber App to provide positive feedback for their ride experience. One of the pre-loaded compliments Uber provides for its riders to give to Uber drivers is called "Late-Night Hero," noting that Uber users "might give this compliment for a **safe (and greatly appreciated) ride home after a late night out**." (emphasis added).

37.     As an additional example, on its website Uber touts the "schedule a ride" feature, which allows users to schedule an Uber ride in advance, similar to a taxi or limousine service, as being helpful for having "a hassle-free evening out," explaining that "[w]hether it's a wedding reception, a cocktail party, or a dinner date with friends, plan a ride in advance so you can relax and have fun."

38.     Thus, through its marketing campaigns, Uber has intentionally endeavored to convince the public that it is safe for intoxicated persons to take an Uber late at night or in the early morning hours.

39.     Until recently, however, Uber has kept hidden from the public and its customers the number of sexual assaults and sexual misconduct reported to Uber by its users.

40.     In a December 5, 2019 report, entitled *2017-2018 US Safety Report* (the "Safety Report" or "Report"), Uber announced that it had received 5,981 reports of sexual assault in 2017 and 2018 by Uber users in the United States alone – an average of just over eight assaults **per day**.[1]

_____

[1]     The Report defines "user" as both riders and drivers, and while the Report notes that some of these reports are actually Uber drivers reporting they were the victims of sexual assault or sexual

41.     Of those incidents, 3,766 were what Uber defines as either "Non-Consensual Touching of a Sexual Body Part," or "Non-Consensual Kissing of a Sexual Body Part."

42.     In its Safety Report, Uber goes to great lengths to explain that: it takes user allegations of sexual assaults and sexual misconduct seriously; it does not ignore reports of sexual assault and misconduct; it seriously investigates each and every user allegation; and it does not take a victim's credibility into account when reviewing claims.

43.     For example, Uber notes that it "take[s] all allegations of sexual assault and sexual misconduct extremely seriously and work[s] to take action quickly and fairly," and that it "rel[ies] heavily on a survivor's statement of experience; it does not require conclusivity, corroboration, or survivor 'credibility' for us to take action."[2]

44.     The Report also touts Uber's investigation process for handling reports of sexual assault and sexual misconduct.

45.     The Report explains that Uber's "US Incident Response Team (IRT) respond to and support people who report safety incidents to Uber. Their goal is to quickly respond to every safety report, handle it with care, and gather robust information that helps enable future incident prevention," and that "Uber created a specialized team within IRT in 2017 to provide specialized customer support to riders and drivers dealing

---

misconduct by Uber riders, the Report does not provide a detailed breakdown of what number or percentage of these 5,981 incidents were reported by Uber drivers as opposed to by Uber riders. *See* UBER, 2017-2018 US SAFETY REPORT 59-60 fn. 177 (2019), available at https://www.uber.com/us/en/about/reports/us-safety-report/ (hereinafter "the Report"). According to the report, however, what Uber defines as "Non-Consensual Sexual Penetration" is the only category of sexual assault or sexual misconduct where detailed data on the victims is available, and that data shows that approximately 92% of the victims who reported such incidents were Uber riders. *See id.* at 68.

[2]     The Report refers to victims of sexual assault and sexual misconduct as "survivors." *See* the Report, at 5.

with the most serious and urgent of incidents, such as reports of sexual assault, that require an in-depth review and victim support."

46.     The Report further notes that when Uber's "Incident Response Team (IRT) receives a report of sexual assault, a trained agent begins by identifying the accused party and their Uber account," that "agents work to obtain the necessary information to make a determination as to whether the accused party's account should be banned from the Uber app," and that "agents make numerous attempts to contact the reporting party, victim, or other witness to clarify the report."

47.     The Report also states that for reports of sexual misconduct, "each incident is routed to the appropriate team of specialized agents, classified, and acted on according to factors including the level of severity and user history."

48.     Notably, Uber does not report allegations or complaints of sexual assault and sexual misconduct to law enforcement agencies, and upon information and belief, does not allow its agents to encourage users to report allegations or complaints of sexual assault and sexual misconduct to law enforcement agencies.[3]

49.     As the Safety Report itself clearly demonstrates, Uber has, and has had for some time, actual knowledge of the risk and danger its users, particularly women, and even more particularly intoxicated women traveling late at night, subject themselves to every time they call an Uber, including the risk of sexual assault and sexual misconduct at the hands of Uber drivers.

50.     Additionally, Uber's own internal investigatory units and numerous media reports of sexual assaults on riders by Uber drivers have necessarily put Uber on notice

---

[3]     That Uber does not report these allegations to law enforcement agencies is implicitly acknowledged in the Report, as Uber never discusses its own reporting of incidents to law enforcement agencies. *See generally*, the Report. Moreover, the Report notes that Uber has a "Law Enforcement Response Team," but goes on to explain that this team is limited to aiding law enforcement agencies by providing them with information Uber is *already* legally required to provide, noting that this team "works diligently to provide information requests **after receiving subpoenas, court orders, or search warrants**." *See id.* at 29 (emphasis added).

since virtually the beginning of its existence that its drivers have preyed upon and sexually assaulted Uber users, particularly intoxicated females.

51.     Indeed, the Safety Report indicates that nearly 90% of the victims of what Uber defines as "Non-Consensual Sexual Penetration" are women or identify as female and acknowledges that "females are disproportionately impacted by sexual violence."

52.     Uber further acknowledges in the Report that "[a]lcohol has been linked to increased vulnerability for potential victims, and it has been used as a tool by offenders to facilitate sexual assault."

53.     Despite this, Uber continues to promote itself as a safe way for the public to travel, specifically including females.

54.     As an example, on Uber's website, on the "Safety" page, the company includes a separate dedicated subpage for "Women's Safety" alongside subpages for "Rider Safety" and "Driver Safety."

55.     On the "Women's Safety" subpage, Uber claims that "[b]ecause we connect millions of people around the world every day, we're committed to building for safety. Learn about our features and processes that help protect you on the road."

56.     While Uber maintains that it uses third-party private background checks to screen drivers, the application process to become an Uber driver is, by Uber's own admission, quick and easy.

57.     For example, Uber promotes its streamlined application process by marketing on its website that prospective drivers simply need to "Download the app. Tap a button. Start making money," and that drivers "can sign up online with your name, phone number, and details about the vehicle you plan to use, plus a few documents like your driver's license and proof of insurance if applicable in your market."

58.     Uber represents that once a prospective driver submits the required paperwork (generally a copy of a driver's license and proof of insurance), their account will be activated within hours, and that a background check—if required at all—may

add an additional three to five days to the process, meaning that a prospective driver could apply to, and be driving for, Uber all in the span of just one week.

59.     Notably, the private background check process run by Uber, unlike many processes mandated by state and federally regulated areas like taxicab licensing, do not include, for example, a live in-person interview, a fingerprint background check, or a background check run by state or federal law enforcement agencies.

60.     Despite this relaxed screening process, Uber touts its screening process and markets its services and drivers as being safe.

61.     For example, Uber's website proclaims that "[t]o help keep you safe, we screen drivers and build our technology with safety in mind."

62.     Once Uber drivers breeze through the application process and begin working for Uber, they are, by the very nature of their job duties, placed into a position of authority and trust uniquely situated for exploiting vulnerable passengers, particularly intoxicated females.

63.     When an Uber rider enters the driver's vehicle, they are immediately placed into a compromised position because of the power dynamic and because of the control that a (presumably sober) Uber driver wields over the rider.

64.     For example, an Uber driver can easily keep the rider captive by locking the doors, having the "child lock" activated, by bringing the rider to a secluded or remote area, and/or by keeping the car moving. In fact, according to media reports and other lawsuits against Uber, these all are methods that Uber drivers have used to sexually assault, attempt to assault, or otherwise prey upon vulnerable riders.

65.     Additionally, if an Uber rider is intoxicated, as, by Uber's own design, Uber passengers often are, they may be unable to defend themselves or resist an attack by the Uber driver.

66.     In the course of using the Uber App and providing a ride, Uber drivers gain access to unique information about each rider, including, in many instances, the location

and/or address of the rider's residence or temporary lodging (*e.g.* a hotel) and/or how to access such residence or lodging, for example, by being provided a gate code or similar information.

67.     As Uber is well aware, as a result of the unique position into which Uber drivers are placed, Uber drivers may exploit vulnerable riders.

68.     As exemplified by this case, the risk to an Uber rider does not end the moment the rider steps out of an Uber driver's vehicle.

69.     Indeed, an Uber driver may utilize the knowledge she gains during the ride or through the Uber App, to harm a rider, either during or immediately after the ride.

70.     More specifically, as in this case, the Uber driver may use her knowledge of the rider's home address and location, and knowledge that the rider is intoxicated, to prey upon and sexually assault the rider.

71.     Uber itself expressly acknowledges that sexual misconduct and/or assault by its drivers can occur even <u>after</u> the rider has exited the vehicle.

72.     For example, in its Safety Report, Uber defines an "Uber-related" sexual assault as one occurring "up to 48 hours after trip completion."[4]

73.     Additionally, Uber's website notes that the company "uses technology to ensure the safety of our riders and drivers before, during **and after** every ride." (emphasis added).

74.     Given Uber's cursory driver application and screening process, its targeted marketing to users as a safe way to get home when intoxicated, and the unique position of access, control, and authority that an Uber driver has relative to a rider, it is very

---

[4]     In explaining Uber's rationale for including such incidents, the Report provides an example of an Uber rider who attempts to remove the Uber driver's clothes without the driver's consent after the rider had arrived at the destination and the trip had been completed. The Report explains that "[e]ven though the trip had ended, the accused party was initially paired with the victim by the Uber app, and the assault occurred within 48 hours of the trip's completion; the incident is therefore Uber-related for the purposes of data classification for this report."

troubling—but not necessarily surprising—that nearly 6,000 incidents of sexual assault were reported by Uber users in the United States in a two-year period, spanning 2017 and 2018.

### The Sexual Assault of Doe

75.     On the afternoon of Saturday, August 24, 2019, Doe and a friend met at Doe's apartment in Athens, Georgia to hang out, do some shopping, and then go out for a night on the town.

76.     Doe and her friend drank some wine at Doe's apartment before heading out for a drink in downtown Athens. Doe and her friend did not eat dinner prior to going out, and the combination of not eating and drinking wine resulted in Doe becoming intoxicated before the pair had left her apartment.

77.     Wanting to be safe and relying on Uber's representations that using Uber was in fact safe, Doe, at approximately 9:45 p.m., "hailed" an Uber using the Uber App to obtain a ride to the Manhattan, a bar in downtown Athens.

78.     Not surprisingly, Doe also planned to use Uber for a ride home later that evening.

79.     Doe and her friend arrived at the Manhattan, which is only 5.6 miles from Doe's apartment complex, at approximately 9:55 p.m.

80.     At the Manhattan, Doe drank two more glasses of wine.

81.     At some point, Doe went to the bathroom at the Manhattan and, overcome by the wine, passed out in one of the bathroom stalls for a short time.

82.     When management at the Manhattan discovered Doe, they requested that she leave. At that time, approximately 12:30 a.m. on Sunday August 25, 2019, Doe, again using the Uber App on her smart phone, "hailed" an Uber for a ride back to her apartment.

83.     When Doe's Uber arrived, Doe's friend helped Doe into the front seat and then climbed into the back seat of the car on the passenger side.

PLAINTIFF'S COMPLAINT FOR DAMAGES

84.     At all times during the ride home, Doe remained silent with her head resting on the passenger side window. At some point during the ride, the Uber driver, a female, asked Doe if she was okay. Doe did not respond. In response to this inquiry, Doe's friend informed the driver that Doe was okay but that Doe had had too much to drink.

85.     Other than the Driver asking Doe if she was okay, there was no interaction whatsoever between Doe and the Uber driver during the trip.

86.     When the Uber driver arrived at Doe's gated apartment complex, which consists of several stand-alone buildings, Doe's friend gave the Uber driver the code to open the gate to the complex. The driver entered the code and proceeded through the open gate.

87.     After winding through the complex back to Doe's building, the Uber driver parked her car directly in front of Doe's apartment building.

88.     Doe and her friend then simultaneously exited the Uber driver's vehicle.

89.     Doe's friend, who was heading out to meet other friends, walked to her own vehicle which was also parked in front of Doe's apartment. Before driving away in her car, Doe's friend observed Doe exit the Uber driver's vehicle and walk, alone, into the breezeway where the door to her (then) ground level apartment is located.

90.     As Doe's friend pulled away in her own car, she observed the Uber driver continuing to sit in her car with the headlights on.

91.     Doe entered her apartment, walked to the couch in her living room, and curled up in a ball on the couch, and closed her eyes.

92.     A few minutes later, Doe's two small dogs began to bark, but Doe ignored it and continued to rest with her eyes closed. After all, Doe had recently moved into this apartment and it was not uncommon her dogs to bark at noises coming from outside.

93.     A few moments later, Doe, sensing that something was amiss, opened her eyes to find the Uber driver standing over her with her pants down.

94.     The Uber driver then stated, "Here, lick this bitch," grabbed a handful of Doe's hair, and forced Doe's face into her vagina in an attempt to force Doe to perform oral sex on her.

95.     Still inebriated, terrified, and fearing for her life, Doe initially complied with the Uber driver's request, but then Doe began to fight back in an attempt to break the Uber driver's hold on her.

96.     A tussle ensued, and the Uber driver, realizing that Doe was able to at least somewhat resist, pulled her pants up and retreated.

97.     Doe, in shock and fearing for her life, curled back into a ball on the couch and watched as the Uber driver began to snoop around the apartment, going into the kitchen for a time, and then opening the doors to, and looking inside, the other rooms in the apartment. The Uber driver then exited without attacking Doe again.

98.     Upon information and belief, the Uber driver was able to enter Doe's apartment because Doe had left the door unlocked—a habit of Doe's.

99.     The next day, Doe awoke at about 8:30 a.m. and took a shower. She was numb and confused. Doe did not go anywhere that day, she just stayed in her apartment. She did talk to her friend who had been with her the night before, but Doe did not tell her what had occurred because she was embarrassed.

100.    Doe remained in a state of shock, embarrassment, and confusion about the assault for several days after the attack, and did not initially tell anyone about it.

101.    Approximately two days later, on or about Tuesday, August 27, 2019, while at work, Doe realized that she had an email from Uber, dated Sunday, August 25, 2019. This email indicated that the Uber driver who had broken into Doe's apartment and sexually assaulted Doe had actually filed a false report with Uber that Doe had assaulted her.

102.     Shocked, confused, and very upset, Doe responded to the email and informed Uber that the driver's account was false, and that in reality the driver had assaulted Doe.

103.     The same day, on or about August 27, 2019, Uber responded to Doe's email reply and stated that the company would open an investigation into the incident.

104.     Doe was so upset that she sought, and was granted, permission to leave work early that day.

105.     When Doe got home, she first called her friend who had been with her the night of the attack and informed her what had happened, including the fact that she had been sexually assaulted by the Uber driver in the early morning hours of August 25, 2019.

106.     Doe also called the Athens-Clarke County Police Department ("ACPD") to report the sexual assault.

107.     On or about the evening of August 27, 2019, two ACPD officers visited with Doe at her apartment and interviewed her.

108.     During the brief time the officers were at Doe's home, Doe's friend who had been with her the night of the assault also arrived to comfort Doe and provide her statement.

109.     Both Doe and her friend provided the officers with their accounts of what happened on the night of August 24 and into the early morning hours of August 25, 2019, and provided the officers with a statement for purposes of the investigation. The Officers informed Doe that an investigation would be conducted, and depending on the results of that investigation, the Uber driver might be arrested.

110.     An ACPD detective later interviewed Doe. In a subsequent follow-up conversation with Doe, the detective informed Doe that when he spoke to the Uber driver, the driver did not deny the sexual contact with Doe but claimed that it was consensual.

111.    Incredibly, neither the ACPD nor Uber appears to have taken Doe's report of sexual assault seriously.

112.    From a review of the public documents available, the ACPD Officers who initially interviewed Doe and her friend appear to never have documented the statements Doe and her friend provided. Body camera footage recently obtained by counsel for Doe reveals that the responding officers not only did not treat Doe's allegations with the dignity which they deserve, but apparently found it amusing that a female had sexually assaulted another female. Indeed, when the lead responding officer learned the particulars of Doe's allegations, he smirked, in fact almost chuckled, and then proceeded to interrogate Doe as if she had done something wrong.

113.    Moreover, the detective assigned to the case does not appear to have taken notes during his interview of Doe and did not record the conversation.

114.    Despite Uber's claims in its Safety Report that it seriously investigates all allegations of sexual misconduct, and that it does not require the victim to "prove" their story, Uber appears to have taken no action whatsoever to investigate Doe's complaint.

115.    As of the date of this filing, Uber never responded further to Doe's complaint. It is unknown what, if any, action Uber took against the driver, but upon information and belief, the driver that assaulted Doe still drives for Uber.

116.    Uber never asked Doe for additional information regarding the sexual assault, and Uber never asked to interview Doe or her friend.

117.    If Uber did investigate this matter, it never communicated the results of any such investigation to Doe.

118.    The sexual assault has caused Doe severe emotional harm.

119.    As a result of the assault, Doe has had, among other symptoms, nightmares, trouble sleeping, increased anxiety, and depression.

120.    Since the assault, Doe frequently cries and has suicidal thoughts.

121.    Due to the assault and the effects it has had on Doe's psyche, Doe lost her job.

### First Cause of Action: Battery – Vicarious Liability and Common Carrier Liability

122.    Doe realleges and incorporates by reference all prior allegations in this Complaint as if fully restated herein.

123.    The Uber driver who sexually assaulted Doe was Defendants' employee.

124.    The sexual assault committed against Doe by Defendants' employee while the employee was performing her job duties constitutes harmful and offensive contact to Doe's person, done intentionally and without Doe's consent.

125.    Defendants are liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

126.    Defendant Uber Technologies is a common carrier who must carry passengers safely, and as a common carrier, Uber Technologies is also vicariously liable for its agents' and employees' intentional and negligent torts.

127.    This is true regardless of whether such agents' or employees' acts were committed within the scope of their employment. Common carriers are held to a higher standard than ordinary negligence and must use reasonable skill to provide everything necessary for safe transportation of its passengers.

128.    Defendant Uber Technologies breached its duty of care in its actions towards Doe.

129.    As a direct and proximate result of the above-outlined conduct, Doe has already sustained, and will continue to sustain, physical injury, and has sustained and will continue to sustain emotional and/or psychological distress, mental anguish, embarrassment, and humiliation.

130.    As a direct and proximate result of the above-outlined conduct, Doe has incurred medical expenses and other economic damages.

131.    Accordingly, Doe is entitled to recovery against Defendants in an amount to be determined at trial.

## Second Cause of Action: Sexual Battery – Vicarious Liability and Common Carrier Liability

132.    Doe realleges and incorporates by reference all prior allegations in this Complaint as if fully restated herein.

133.    The Uber driver who sexually assaulted Doe was Defendants' employee.

134.    Defendants' employee, while the employee was performing her job duties, forced Doe to perform oral sex on her.

135.    Defendants' employee, during the act of forcing Doe to perform oral sex on her, acted with the intent to cause a harmful or offensive contact with Doe by using her sexual organ, and a sexually offensive contact with Doe directly resulted.

136.    Defendants are liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

137.    Defendant Uber Technologies is a common carrier who must carry passengers safely, and as a common carrier, Uber Technologies is also vicariously liable for its agents' and employees' intentional and negligent torts.

138.    This is true regardless of whether such agents' or employees' acts were committed within the scope of their employment. Common carriers are held to a higher standard than ordinary negligence and must use reasonable skill to provide everything necessary for safe transportation of its passengers.

139.    Defendant Uber Technologies breached its duty of care in its actions towards Doe.

140.    As a direct and proximate result of the above-outlined conduct, Doe has already sustained, and will continue to sustain, physical injury, emotional and psychological distress, mental anguish, embarrassment and humiliation.

141.     As a direct and proximate result of the above-outlined conduct, Doe has incurred medical expenses and other economic damages.

142.     Accordingly, Doe is entitled to recovery against Defendants in an amount to be determined at trial.

## Third Cause of Action: Assault – Vicarious Liability and Common Carrier Liability

143.     Doe realleges and incorporates by reference all prior allegations in this Complaint as if fully restated herein.

144.     The Uber driver who sexually assaulted Doe was Defendants' employee.

145.     The sexual assault of Doe by Defendants' employee while the employee was performing her job duties created a reasonable apprehension in Doe of immediate harmful or offensive contact to Doe's person, done intentionally and without Doe's consent.

146.     Defendants are liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

147.     Defendant Uber Technologies is a common carrier who must carry passengers safely, and as a common carrier, Uber Technologies is also vicariously liable for its agents' and employees' intentional and negligent torts.

148.     This is true regardless of whether such agents' or employees' acts were committed within the scope of their employment. Common carriers are held to a higher standard than ordinary negligence and must use reasonable skill to provide everything necessary for safe transportation of its passengers.

149.     Defendant Uber Technologies breached its duty of care in its actions towards Doe.

150.     As a direct and proximate result of the above-outlined conduct, Doe has already sustained, and will continue to sustain, physical injury, emotional and psychological distress, mental anguish, embarrassment and humiliation.

151.    As a direct and proximate result of the above-outlined conduct, Doe has incurred medical expenses and other economic damages.

152.    Accordingly, Doe is entitled to recovery against Defendants in an amount to be determined at trial.

**Fourth Cause of Action: False Imprisonment – Vicarious and Common Carrier Liability**

153.    Doe realleges and incorporates by reference all prior allegations in this Complaint as if fully restated herein.

154.    The Uber driver who sexually assaulted Doe was Defendants' employee.

155.    Defendants' employee, while performing her job duties, restrained Doe while Doe was seated on her couch, in her apartment, and forced Doe to perform oral sex on her. Accordingly, Doe was confined on her couch by Defendants' employee against her will for a significant period of time.

156.    During her confinement, Doe reasonably feared for her safety.

157.    Defendants are liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

158.    Defendant Uber Technologies is a common carrier who must carry passengers safely, and as a common carrier, Uber Technologies is also vicariously liable for its agents' and employees' intentional and negligent torts.

159.    This is true regardless of whether such agents' or employees' acts were committed within the scope of their employment. Common carriers are held to a higher standard than ordinary negligence and must use reasonable skill to provide everything necessary for safe transportation of its passengers.

160.    Defendant Uber Technologies breached its duty of care in its actions towards Doe.

161.     As a direct and proximate result of the above-outlined conduct, Doe has already sustained, and will continue to sustain, physical injury, emotional and psychological distress, mental anguish, embarrassment and humiliation.

162.     As a direct and proximate result of the above-outlined conduct, Doe has incurred medical expenses and other economic damages.

163.     Accordingly, Doe is entitled to recovery against Defendants in an amount to be determined at trial.

## Fifth Cause of Action: Trespass – Vicarious Liability and Common Carrier Liability

164.     Doe realleges and incorporates by reference all prior allegations in this Complaint as if fully restated herein.

165.     The Uber driver who sexually assaulted Doe was Defendants' employee.

166.     Doe leased and occupied the apartment where the sexual assault occurred at the time she was sexually assaulted by Defendants' employee.

167.     Defendants' employee intentionally entered Doe's property, while performing her job duties, in order to perpetrate the sexual assault on Doe.

168.     Doe did not give Defendants' employee permission to enter into her apartment.

169.     Doe was actually harmed as a result of Defendants' employee's trespass.

170.     Defendants' employee's conduct and entry into Doe's apartment was a substantial factor in causing Doe's harm.

171.     Defendants are liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

172.     Defendant Uber Technologies is a common carrier who must carry passengers safely, and as a common carrier, Uber Technologies is also vicariously liable for its agents' and employees' intentional and negligent torts.

173.     This is true regardless of whether such agents' or employees' acts were committed within the scope of their employment. Common carriers are held to a higher standard than ordinary negligence and must use reasonable skill to provide everything necessary for safe transportation of its passengers.

174.     Defendant Uber Technologies breached its duty of care in its actions towards Doe.

175.     As a direct and proximate result of the above-outlined conduct, Doe has already sustained, and will continue to sustain, physical injury, emotional and psychological distress, mental anguish, embarrassment and humiliation.

176.     As a direct and proximate result of the above-outlined conduct, Doe has incurred medical expenses and other economic damages.

177.     Accordingly, Doe is entitled to recovery against Defendants in an amount to be determined at trial.

### Sixth Cause of Action: Intentional Infliction of Emotional Distress – Vicarious and Common Carrier Liability

178.     Doe realleges and incorporates by reference all prior allegations in this Complaint as if fully restated herein.

179.     The Uber driver who sexually assaulted Doe was Defendants' employee.

180.     Defendants' employee, while performing her job duties, engaged in conduct toward Doe that is extreme and outrageous so as to exceed all bounds of decency in a civilized society, namely that the employee entered Doe's apartment without permission and sexually assaulted Doe.

181.     Defendants are liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

182.     Defendant Uber Technologies is a common carrier who must carry passengers safely, and as a common carrier, Uber Technologies is also vicariously liable for its agents' and employees' intentional and negligent torts.

183.    This is true regardless of whether such agents' or employees' acts were committed within the scope of their employment. Common carriers are held to a higher standard than ordinary negligence and must use reasonable skill to provide everything necessary for safe transportation of its passengers.

184.    By her actions and conduct, Defendants' employee intended to, and did, intentionally and recklessly cause Doe to suffer severe emotion distress.

185.    As a direct and proximate result of Defendants' employee's above-outlined conduct, Doe has already sustained, and will continue to sustain, severe emotional and psychological distress, for which Doe is entitled to an award of damages.

186.    As a direct and proximate result of the above-outlined conduct, Doe has incurred medical expenses and other economic damages.

187.    Uber engaged in the above-outlined conduct with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Doe, so as to warrant the imposition of punitive damages under California Civil Code § 3294.

188.    Accordingly, Doe is entitled to recovery against Defendants in an amount to be determined at trial.

**Seventh Cause of Action: Failure to Warn – Common Carrier Liability**

189.    Doe realleges and incorporates by reference all prior allegations in this Complaint as if fully restated herein.

190.    The Uber driver who sexually assaulted Doe was Defendants' employee.

191.    While performing her job duties, Defendants' employee used her position of access, control, and authority as a result of being Doe's Uber driver, as well as her knowledge of Doe's intoxicated state, home address, and location, also obtained as a result of being Doe's Uber driver, to exploit and sexually assault Doe.

192.    Uber has, and has had for some time, actual knowledge of the risk of sexual assault and sexual misconduct, including sexual assaults by Uber drivers on riders, that Uber riders face when they take an Uber.

193.    In fact, the Safety Report shows that Uber had knowledge of nearly 6,000 reported incidents of sexual assault dating back to at least 2017 in the United States, including numerous reports of Uber drivers sexually assaulting riders.

194.    Additionally, Uber's own internal investigatory units and numerous media reports of sexual assaults on riders by Uber drivers have necessarily put Uber on notice since virtually the beginning of its existence that its drivers have preyed on and sexually assaulted Uber users, particularly intoxicated females.

195.    Defendant Uber Technologies is a common carrier who must carry passengers safely, and as a common carrier, Uber Technologies is also vicariously liable for its agents' and employees' intentional and negligent torts.

196.    This is true regardless of whether such agents' or employees' acts were committed within the scope of their employment. Common carriers are held to a higher standard than ordinary negligence and must use reasonable skill to provide everything necessary for safe transportation of its passengers.

197.    Because Defendant Uber Technologies is a common carrier, it has a special relationship with Doe which includes an affirmative duty to prevent harm to Doe and to warn Doe of known potential hazards.

198.    Defendant Uber Technologies breached its duty of care in its actions towards Doe by failing to warn Doe of the known hazard of Uber drivers perpetrating sexual assaults on Uber riders.

199.    As a direct and proximate result of the above-outlined conduct, Doe has already sustained, and will continue to sustain, physical injury, emotional and psychological distress, mental anguish, embarrassment, and humiliation.

200.     As a direct and proximate result of the above-outlined conduct, Doe has incurred medical expenses and other economic damages.

201.     Accordingly, Doe is entitled to recovery against Defendants in an amount to be determined at trial.

## Eighth Cause of Action: Fraud

202.     Doe realleges and incorporates by reference all prior allegations in this Complaint as if fully restated herein.

203.     Uber has, and has had for some time, actual knowledge of the risk of sexual assault and sexual misconduct, including sexual assaults by Uber drivers on riders, that Uber riders face when they take an Uber.

204.     In fact, the Safety Report shows that Uber had knowledge of nearly 6,000 reported incidents of sexual assault dating back to at least 2017 in the United States, including numerous reports of Uber drivers sexually assaulting riders.

205.     Additionally, Uber's own internal investigatory units and numerous media reports of sexual assaults on riders by Uber drivers have necessarily put Uber on notice since virtually the beginning of its existence that its drivers have preyed on and sexually assaulted Uber users, particularly intoxicated females.

206.     Uber made intentional misrepresentations of fact to Doe, known by Defendant Uber to be false and/or substantially misleading, including, but not limited to, claims that Uber would employ a driver for Doe's Uber trips that was adequately screened by Uber when Uber knows that it fails to adequately screen its drivers in a meaningful way; and that it was safe for Doe—even while intoxicated—to call an Uber to transport her even though Uber had actual knowledge of the high numbers of sexual assaults reported to it, and actual knowledge that alcohol puts riders at an increased risk of being the victim of a sexual assault or sexual misconduct.

207.     Uber made the false statements and misrepresentations described herein, including the statements concerning its driver screening, and the safety of Uber rides,

knowingly, or with a willful, wanton and reckless disregard for the truth, and Uber intended to deceive and defraud Doe into agreeing to use Uber's App and Uber's services.

208.    Uber made the false statements and misrepresentations described herein, including the statements concerning its driver screening, and the safety of Uber rides, with the intent to cause Doe to rely on this false and misleading information to induce her into using the Uber App and Uber's services.

209.    Doe actually and reasonably relied on Uber's false statement of facts and misrepresentations when she agreed to use the Uber App and use Uber's transportation services, after being told that Uber had properly and adequately screened her Uber driver, and that Uber would provide her with a safe ride, even if she was intoxicated.

210.    As a result of Uber's deliberate and willful misrepresentation of material facts, Doe suffered, and continues to suffer, harm, including, physical injury, emotional and psychological distress, mental anguish, embarrassment, and humiliation.

211.    Accordingly, Doe is entitled to recovery against Defendants in an amount to be determined at trial.

## Ninth Cause of Action: Attorneys' Fees and Costs Under California Civil Code § 1021.5

212.    Because Defendant Uber's fraudulent business acts and practices as described herein affect potentially hundreds of thousands, if not millions, of consumers in California and across the country, Doe's current lawsuit constitutes the enforcement of an important right affecting the public interest as that term is defined under California Civil Code § 1021.5.

213.    Because Doe's current lawsuit constitutes the enforcement of an important right affecting the public interest as that term is defined under California Civil Code § 1021.5, and because, if Doe is successful, this suit will cause a significant benefit, either pecuniary or nonpecuniary, on the general public or a large class of persons, and

because such fees should not in the interest of justice be paid out of the recovery, if any, Doe is entitled to recover her attorneys' fees and costs under California Civil Code § 1021.5.

## **Prayer for Relief**

WHEREFORE, Plaintiff Jane Doe seeks the following relief:

**A.**    An award of damages in an amount to be determined at trial to compensate Plaintiff for all of her physical, severe emotional, monetary and/or economic harm and expenses, including, but not limited to, mental anguish and physical pain and suffering, harm to her personal and professional reputation, and all other monetary and non-monetary losses suffered by Plaintiff;

**B.**    An award of pre-judgment and post-judgment interest as allowed by law;

**C.**    An award of punitive damages in an amount sufficient to punish Uber and deter it and others from engaging in similar conduct in the future;

**D.**    An award for costs and expenses, including attorneys' fees, to the fullest extent permitted by law; and

**E.**    For such other and further relief as this Court deems just and proper.

*[Signatures appear on following page]*

DATED: February 7, 2020.

Respectfully submitted,

**JOHNSON TRIAL LAW, LLC**

*/s/ James M. Johnson*
JAMES M. JOHNSON
California Bar No. 229811
100 Wilshire Boulevard
Suite 700
Santa Monica, CA 90401
Telephone: (424) 272-6680
Email: james@johnsontrial.com

**PARKER HUDSON RAINER & DOBBS LLP**
V. Justin Arpey
*Admission Pro Hac Vice Pending*
Erik J. Badia
*Admission Pro Hac Vice Pending*
303 Peachtree Street, N.E.
Suite 3600
Atlanta, Georgia 30308
(T): (404) 523-5300
(F): (404) 522-8409
Email: jarpey@phrd.com
            ebadia@phrd.com

*Counsel for Plaintiff Jane Doe*

1
2

## **DEMAND FOR JURY TRIAL**

3

Plaintiff hereby demands a jury trial.

4

This 7th day of February, 2020.

5

**JOHNSON TRIAL LAW, LLC**

6

7     */s/ James M. Johnson*
      JAMES M. JOHNSON

8     California Bar No. 229811
      100 Wilshire Boulevard

9     Suite 700
      Santa Monica, CA 90401

10    Telephone: (424) 272-6680

11    Email: james@johnsontrial.com

12
      **PARKER HUDSON RAINER & DOBBS LLP**

13    V. Justin Arpey
      *Admission Pro Hac Vice Pending*

14    Erik J. Badia

15    *Admission Pro Hac Vice Pending*
      303 Peachtree Street, N.E.

16    Suite 3600

17    Atlanta, Georgia 30308
      (T): (404) 523-5300

18    (F): (404) 522-8409

19    Email: jarpey@phrd.com
              ebadia@phrd.com

20

21    *Counsel for Plaintiff Jane Doe*

22

23

24

25

26

27

28